THE STATE OF IOWA, Appellee, v. GLENN GULLIVER, Appellant.

Criminal law: ASSAULT WITH INTENT TO ROB: EVIDENCE. On this prosecution for assault with intent to rob the evidence is held sufficient to support a judgment of conviction.

Evidence: ORDER OF INTRODUCTION: DISCRETION. The order of the introduction of evidence is so largely a matter of discretion that the rulings of the trial court will not be disturbed except for manifest abuse of discretion.

Criminal law: ALIBI: ORDER OF PROOF. Where the defendant in a criminal action offers evidence in support of an alibi the state is entitled to meet the same by evidence in rebuttal, even though there was evidence in chief for the state that defendant was at the place where the crime was committed on the day in question.

Same: REMARKS OF COURT: PREJUDICE. It is very natural and often proper for the court, in ruling upon questions arising during the trial, to make some suggestions intended to keep the proceedings within due limits and to prevent obscuration of the real issues by irrelevant matter. In the instant case the suggestion of the court that a certain immaterial statement by the witness was harmless,

and the further suggestion that an inquiry of another witness was hardly a fair question, were not prejudicial.

Same. The remark of the court that certain immaterial evidence ought to be omitted and that he did not see how it would be helpful, and that too much time should not be taken up with details, did not constitute reversible error.

Same: EXCLUSION OF IMMATERIAL EVIDENCE. Evidence that another party was suspicioned as guilty of the crime charged to defendant and was shadowed by the officers, as well as what was said by an unidentified person to one of the witnesses shortly after the crime was committed, was properly excluded as immaterial.

Same. Evidence that one, in no manner connected with the prosecution of a crime, had approached certain witnesses and made statements to them adverse to the defendant was hearsay and inadmissible, in the absence of any showing that such witnesses had been corrupted.

New trial: MISCONDUCT IN ARGUMENT. The misstatement of counsel in argument that the evidence of a certain witness stands alone or uncorroborated, though in fact corroborated by other witnesses, is not such misconduct as will authorize a new trial, where the evidence was voluminous and the witnesses many; although if knowingly made it would be unprofessional.

Same. Criticism in argument of the accused for not having disclosed his defense at the preliminary hearing, and contending that it was an afterthought, was not misconduct requiring a new trial.

Same. The fact that counsel in argument sought to discredit one of defendant's witnesses in a manner calculated to reflect on defendant, although there was no evidence to justify it and the remarks were therefore improper, was not prejudicial; since there was unimpeached evidence to the same effect.

Trial: JUDICIAL UNFAIRNESS: EVIDENCE. Where defendant was given unusual latitude in summoning and examining witnesses, the fact that the court at times made suggestions looking toward the elimination of inquiry into collateral and irrelevant matters, with a view of hastening the termination of the trial, was not sufficient to sustain a charge of unfairness.

Criminal law: ALIBI: INSTRUCTION. Where the court instructed that if upon a fair consideration of all the evidence, including that pertaining to the defense of alibi, there was a reasonable doubt of

defendant's guilt he should be acquitted, the statement in the same connection that ''to be entitled to weight the evidence of alibi must be such as to show that defendant at the time of the crime was so far away that he could not have been present,'' was not misleading or erroneous.

Same: INSTRUCTIONS: PREJUDICE OF COMMUNITY.   The instruction that the jury should not be influenced ''by any feeling of excitement or prejudice in the community, which has less reliable knowledge of the facts and less legal and moral responsibility than you have, acting upon your oaths,'' was not objectionable as implying the right to consider public feeling and prejudice if believed to be on as reliable knowledge of the facts as the jurors themselves had; the court also instructing that the investigation should be conducted looking only to the evidence produced before the jury, and with ⁀ the view of doing entire justice under the evidence and the law as given by the court.

Same: ASSAULT WITH INTENT TO ROB: INDICTMENT: WAIVER OF OBJECTION.   An indictment for an assault with intent to rob need not allege the ownership of the property it is claimed defendant intended to take; but if the indictment was defective in this respect it was waived by going to trial without first raising the objection.

Same: NEW TRIAL: NEWLY DISCOVERED EVIDENCE.   In criminal cases newly discovered evidence is not a recognized ground for new trial, unless possibly where it has been discovered that material false evidence was produced by the state.   But where the claimed newly discovered evidence was not of new evidential facts, but of new witnesses to the same facts, and so far as tending to impeach testimony already taken it could have been produced at the trial with reasonable diligence, a new trial was properly denied.

Same: NEW TRIAL: PUBLIC PREJUDICE.   Public prejudice is not a ground for new trial where there were no demonstrations of such character as to intimidate the jury, or to indicate that the verdict was anything other than the honest conclusion of the jury.

Same: NEW TRIAL: MISCONDUCT OF JURORS.   There was evidence in this case that defendant, charged with assaulting the cashier of a bank with intent to rob, introduced himself to the cashier as ''Gains,'' which he denied.   During the trial one of the jurors overheard a statement that defendant had taken the part of a character named Gains in a theatrical play, and that he had at some time been suspected of stealing money, but the juror testified that the statements were not addressed to him, that they were given no weight by him, and were not discussed in the jury room.   There

were also other charges of improper conduct but all were denied or explained. *Held,* insufficient to require a new trial.

*Appeal from Mitchell District Court.*—HON. C. H. KELLY, Judge.

TUESDAY, SEPTEMBER 16, 1913.

DEFENDANT was convicted upon a charge of assault with intent to rob, and appeals. *Affirmed.*

*Wm. H. Salisbury,* for appellant.

*Geo. Cosson,* Attorney General, *John Fletcher,* Assistant Attorney General, *A. A. Kugler,* County Attorney, and *A. B. Lovejoy,* for the State.

WEAVER, C. J.—Orchard, the scene of the alleged crime, is situated in Mitchell county, Iowa, about five miles from Osage, the county seat. At the time in question a banking business was being conducted at that village under the immediate charge of E. O. Clapper as cashier. The defendant, Glenn Gulliver, is a young man of twenty-two years of age, and for the larger portion of his life had been a resident of Mitchell county, having made his home at Orchard and later at Osage, where he attended high school, from which he graduated about the year 1906. So far as appears he had maintained a reputable character in the community where he was known. After leaving school he found employment as advance agent and later as business manager of a minor theatrical company or troupe traveling from Chicago, Ill. During this period he frequently returned to Mitchell for periods which sometimes extended into weeks or months and on one or more occasions assisted some school or society in preparing and presenting a dramatic performance. It follows from these circumstances that he was familiarly, or at least casually, known to many of the people of that county. He is, moreover,

a person of noticeable appearance, being six feet two and one-half inches in height but quite slender, weighing only about one hundred and forty pounds. The cashier, Clapper, though older than defendant, is still a young man. He had lived in Mitchell county for many years, and, during part of the time when defendant was attending high school in Osage, Clapper was a student in a seminary on the opposite side of the street. Both were engaged in various employments about town. Defendant says they were personally acquainted, but this the cashier denies, and says that he has no remembrance of defendant at all prior to the circumstances attending and immediately preceding the offense charged in the indictment. Clapper is less than six feet in height and weighs about two hundred pounds.

On Thursday, December 14, 1911, a person unknown to the cashier came into the bank introducing himself by the name of Gains and claiming to be a sales agent for a manufacturer of gasoline engines at Waterloo, Iowa. He made inquiries concerning the financial standing of certain farmers residing in the neighborhood and mentioned the names of persons to whom he hoped or expected to sell engines. He spent a large part of the afternoon in the bank, and, the weather being cold, Clapper invited him into the office back of the counter, where he sat most of the time carrying on a general conversation with the cashier and his wife, who was also present. On the afternoon of the following day he returned to the bank reporting alleged negotiations for the sale of engines and was again invited into the office, where he remained until the usual hour for closing—about 4:30 p. m. Leaving him sitting by the stove, Clapper turned to the money drawer and was engaged in gathering up its contents preparatory to placing them in the safe, when Gains, without speaking or making any demand, assaulted him, striking him twice upon the back of the head. Not being disabled by the blows, Clapper turned upon his assailant, who immediately fled and disappeared from the village. So far as seen by the cashier,

Gains was not armed with any weapon, though the wounds alleged to have resulted from the blows would seem to indicate something more than a stroke with the naked fist. That the assault was made with intent to rob the cashier or the bank is inferred only from the fact that it was made in the bank upon the person in charge thereof, and the further fact that no other known motive or explanation is suggested. On the following day, suspicion having been directed against the defendant as the perpetrator of the offense, he was arrested at Osage. His indictment, trial, and conviction followed.

The record presents some remarkable features. The trial was contested with great stubbornness on both sides and occupied the attention of the court and jury ten days. More than one hundred witnesses were examined at great length. The printed abstracts aggregate nearly one thousand one hundred pages, to which are added eight hundred and fifty pages of argument by counsel. The motion for new trial twice amended assigns thirty or more grounds thereof and is supported and resisted by an array of more than fifty exhibits. In this court ninety-one alleged errors are assigned and argued with much thoroughness. These things are here mentioned, not by the way of criticism, but to make clear the manifest impossibility of compressing within the allowable limits of an opinion anything like a full or complete statement of the testimony or of supplementing such statement by a complete review of the arguments of counsel. We shall therefore, when possible, avoid all reference to the testimony of individual witnesses and speak only of facts, inferences, and conclusions which in our judgment the jury could properly have drawn from the evidence in its entirety and discuss only those legal propositions which appear to us controlling upon the disposition of the appeal.

I. Has the verdict of the jury sufficient support in the evidence?

While other errors are assigned and insisted upon in behalf of the appellant, it is argued with great confidence and

much force that defendant's guilt has not been established by

1. CRIMINAL LAW:
assault with
intent to rob:
evidence.

such clear and satisfactory proof as is necessary to sustain a conviction. In this, as in most criminal cases—the *corpus delicti* being assumed or established—the contest before the jury was centralized upon the identity of the accused with the perpetrator of the offense, and this in turn was made to rest upon the more or less positive testimony offered by the state which was met by his denial of guilt supplemented and supported by evidence of an alibi. This defense not unusually gives rise to sharp and irreconcilable conflict in evidence, but the books contain the report of very few cases in which such conflict is more radical and more difficult to reconcile with the charitable presumption of good faith and candor on the part of all the witnesses than is here presented.

The alibi relied upon by the defendant differs from the ordinary case in this, that it involves the question of his actual location not merely upon the day of the crime but upon the previous day as well. The theory of the state's case is that the man known as Gains, who assaulted Clapper in the bank on Friday, December 15, 1912, was in the same place the day before, spending a large part of the time in the same bank, and that Gains and the defendant are one and the same person. It follows, of course, that even if defendant was in Orchard on Friday afternoon, or so near that he could have been present at the scene of the crime, his alibi may yet be sufficiently established upon proof that on Thursday afternoon when Gains was visiting the bank defendant was himself so far distant from Orchard as to render his identity with Gains impossible, or at least sufficient to raise a reasonable doubt in the minds of the jury. The theory of the state is supported with varying degrees of positiveness by several witnesses who swear to seeing defendant in Orchard on both Thursday and Friday. Some of them say they saw him in the bank on Thursday, and others say they saw him there still earlier in

the week, while Clapper and wife both testify with much assurance that defendant is the man whom they knew as Gains who was in the bank on both days.

It is fair to say that the effect of the testimony of some of these witnesses was to some extent weakened on cross-examination. None of them except Clapper and his wife claim to have had any conversation with the person whom they recognized as defendant, and several of them betray some degree of uncertainty in their conclusions or in the accuracy of their memories. The defendant concedes that he was in Orchard for a very brief interval on Friday, but returned to Osage about noon, staying there the entire remainder of the day. He insists, however, and in this he is supported by a large number of witnesses, that not only was he in Osage at the hour when the crime was committed, but that he was in the city of Chicago, Ill., during all the earlier part of the week until an early hour of Thursday morning, when he took a westward bound train on the Illinois Central Railway, purchasing transportation to Charles City, Iowa, where he had a business errand. According to his story, he met one or more acquaintances on the train, took breakfast at Waterloo, Iowa, where he met other acquaintances, and thence passed on to Charles City, where he arrived Thursday noon. He says he remained in Charles City all that afternoon, meeting and talking with many different persons to whom he was well known and taking an early evening train arrived at the home of his mother in Osage about 8 o'clock. This story in most of its essential details is strongly corroborated by several different witnesses in Chicago, who say as of their own knowledge that defendant was in that city all of the week of December 14 and 15, 1911, until after midnight of Wednesday; by several more who saw him on the train or at Waterloo on Thursday morning; and by numerous others in Charles City who swear they saw him there on Thursday afternoon at such times that if they speak the truth he cannot be the man Gains who was in

the bank at Orchard the most of that afternoon. His alibi for Friday afternoon also finds corroboration in the testimony of many witnesses who are apparently respectable people in Osage.

As in the case of the state's witnesses some of those testifying for the defendant are on cross-examination led into some qualification of their more positive statements. We have thus a vital question upon which there is an irreconcilable conflict in the evidence. Speaking for himself alone, the writer of this opinion does not hesitate to say that a reading of the testimony leaves him in such grave doubt upon the possibility of the defendant's presence at Orchard on any day of that week prior to Friday—a doubt which necessarily extends to his identity with the person who assaulted the cashier on the following day—that if this court was authorized to retry fact questions in criminal cases he would be in conscience bound to vote for an acquittal. But the state's case is not without evidence in its support. The veracity of the witnesses and the weight and value of their testimony were for the jury alone, and it is not within the province of the court to review such finding except so far as may be required to ascertain whether there is anything in the testimony which, if believed by the jury, affords reasonable ground for sustaining the verdict. In the case before us there is positive and unequivocal testimony that defendant was the very person who committed the assault, and other testimony that for at least two days he was in the neighborhood where it was possible for him to have been guilty of the offense with which he is charged, and, while the countervailing testimony is very strong, the court cannot say that the jury exceeded its authority or violated its sworn duty in believing the former to be true and the latter false or mistaken. The verdict cannot be set aside for want of evidence to support it.

II.   After the state had offered its evidence in chief, in-

cluding the testimony of many witnesses tending to show that
defendant was in the vicinity of Orchard and Osage on both
Thursday and Friday of the week in question,
and after the defendant had introduced his
evidence and rested, the state was permitted
to examine in rebuttal several witnesses who testified to seeing
him in Orchard or upon the streets of Osage at times during
Thursday and Friday when, according to his showing, he was
elsewhere. Of the admission of this testimony the appellant
complains, but his abstract fails to show any objection made
or exception taken on which to ground an assignment of error.
But passing that defect in the record, the order of introducing
testimony is so much a matter of discretion in the trial court
that its ruling will not be held erroneous except where abuse
of such discretion is apparent.

2. EVIDENCE:
order of intro-
duction:
discretion.

Moreover, it would be placing the state at an unfair dis-
advantage to hold that it may not meet or contest the defend-
ant's alibi by evidence in rebuttal. The state cannot always
or even ordinarily anticipate a defendant's
showing in that respect. The defense of alibi
is to a degree affirmative in character, and
the testimony in its support not infrequently comes as a matter
of surprise to the prosecution. The right to rebut such a
defense has never before been questioned. It is true, as
counsel say, that the state may not rightfully conceal its hand,
and, after making a mere *prima facie* case and drawing the
defendant into disclosing his defense so far as he deems it
necessary to meet the case made by the prosecution against
him, proceed in rebuttal to overwhelm him with reserved evi-
dence properly admissible in chief. *State v. Parish*, 22 Iowa,
284. But the record here presented does not bring it within
the rule or reason of the cited decision.

3. CRIMINAL LAW:
alibi: order of
proof.

III. As we have already noted, the trial was extended
to an unusual length and a great volume of evidence taken.

At nearly every step the insistence of counsel upon the one side for the admission of alleged pertinent testimony, and strenuous objection thereto by the other side, called for the interference, control, and ruling of the court. It was neither unnatural nor improper that some of these rulings should be accompanied by remarks or suggestions intended by the court to keep the proceedings within due limits and to prevent obscuration of the real issue by irrelevant matter which tended to fill the minds and memories of the jury with a mass of details not necessary to an intelligent verdict upon the question of defendant's guilt or innocence. Very many of these remarks have been excepted to by defendant as tending to prejudice his defense in the minds of the jurors. We cannot extend this opinion for their quotation in full or their discussion in detail. It is due to counsel for the defense to say that he manifests throughout the record a sincere belief in the innocence of his client, and that his conduct of the defense has been marked by an intensity of zeal and earnestness in every way commendable; but we think it is quite clear that the very warmth of his convictions upon the general merits of the case makes him unduly critical of the court's language and rulings.

4. SAME: remarks of court: prejudice.

For instance, one Seifert is said to have been in the bank at Orchard on Thursday or Friday when "Gains" (or defendant) was there. Clapper the cashier was examined with reference to that incident. From the record of his testimony we make the following excerpt: "A. And when Mr. Seifert came in after a draft, Mr. Gains was standing by the second window; I think that is where he was standing when Mr. Seifert came, and Mr. Seifert spoke to him, and said, 'How do you do?' But of course I didn't know that they knew him personally." Mr. Salisbury objected as follows: "Now we want those things cut out. We object to that as immaterial and improper. By the Court: And also harmless. Mr. Salisbury: I hope so. Mr. Lovejoy for State: Absolutely. By the Court: Just omit these remarks about whether you did or did not know certain matters."

Now it is seriously contended that in some way the court's statement that the comment of the witness was "harmless" constitutes error. Both the testimony of the witness and the statement of the court are clearly without prejudice to the defense. It is true the witness was not asked whether he knew of the prior acquaintance, if any, between these two persons, and his remark may have been uncalled for, but how did it prejudice the defendant's case? It is practically impossible to conduct a protracted examination of any witness without eliciting some statement, remark, or comment which literally and technically speaking is irrelevant or immaterial; but, unless it is of a character to influence or mislead the jury, no court undertakes to prune the record of all these little excrescences. They are "harmless," and therefore ignored.

Another complaint is made that a witness having testified for the state, and being asked upon cross-examination whether in his testimony at the preliminary hearing he had not made a certain statement quoted from the record of that hearing, and having admitted the same, was thereupon asked by counsel, "Why have you changed it?" To this the state objected as an assumption that the witness had changed his testimony, and the court said, "Well, that is hardly a fair question." To this remark an exception is also urged. The suggestion of the court was not at all improper. The question as put to the witness contains an implied accusation or suggestion that the witness had in some material way changed the substance or meaning of the testimony given by him on the former occasion, when as a matter of fact the record shows no material divergence between the two statements. Such method of interrogation is not "quite fair," and the court's suggestion was not uncalled for. A witness should not be cowed or put upon the defensive by the aggressiveness of counsel until at least he has manifested such interest or involved himself in such apparent contradiction or inconsistency as to justly call for rebuke. In no event could this incident have worked prejudice to the defense. The record of the witness on both hearings was given

to the jury, and, if there was any essential variation therein, the defendant had the benefit of it.

Again, the defendant sought to show that as the result of a high school entertainment conducted by him in Mitchell county shortly before the alleged crime he made a profit of $200. In supporting the state's objection thereto the court remarked to counsel: "You ought to omit that, Mr. Salisbury; I do not see how that will help us." At another point one Smith testified for the defense that he was on the Illinois Central train leaving Chicago for Iowa on Thursday morning, and that among his fellow passengers on that occasion he saw the defendant. He was further asked by counsel "how much he saw of the defendant" at that time. The court ruled out the answer, saying, "I would not take too much time with these details." There was no error in either ruling or in either remark. In the first instance the fact whether defendant did or did not reap a profit from the entertainment had no such bearing upon or connection with his alleged guilt as to make it admissible on any theory of the case—and this was the sum and substance of the court's language. In the latter instance the point of Smith's testimony was in the fact that he saw defendant on the train on that particular morning, and not in whether he saw much or little of him. Considering the extreme length of the trial, the court should not be censured for attempting to eliminate all nonessential details. Without further pursuing this line of the appellant's exceptions, we may say that all are controlled by the principles and considerations already mentioned and we find no reversible error in them.

IV. Of the exceptions to evidence admitted in behalf of the state, some have already been disposed of. Of others, the following may be mentioned as illustrative of the objections raised: Defendant sought to show by one Thomas that directly after the assault the witness was shadowed by the officers of the law on suspicion that he was the guilty party. It would seem

5. SAME.

6. SAME: exclusion of immaterial evidence.

to require no argument justifying the ruling which excluded this kind of testimony. The officers cannot be supposed to have known who did the deed. They may not yet have heard of defendant as an object of suspicion in connection therewith, or, even if they had heard such charge or conjecture, it was clearly within the scope of their duties to continue their examination and inquiry to develop the truth and to that end follow up all apparent clues to a satisfactory conclusion. To open the door to such latitude of inquiry would make trials interminable and result in confusing the jury with a multitude of irrelevant matters having no direct or logical bearing on the real issue—the guilt or innocence of the man on trial.

Even more manifest is the lack of merit in the exception to the court's ruling excluding evidence of what was said by an unidentified stranger or tramp who appeared at the door of a witness living near Orchard on Monday morning after the assault on Friday. It is difficult to believe that this could have been offered with any confidence in its admissibility. It is too clearly incompetent to require discussion or citation of authority.

Somewhat in the same class was the offer to show that an agent or detective representing a banker's association had been investigating the case in the interest of such association and had approached certain witnesses and made certain statements adverse to the defendant. There was no claim that any witness had been corrupted by this man or that he in any manner represented or was authorized to speak or act for the prosecuting witness or for the officers of the law charged with the duty of prosecution. It not infrequently occurs that when a crime is charged, and especially where the case is one involving much mystery or public interest, ambitious aspirants and pretenders to fame, as "detectives," swarm about, and, though wholly without authority to speak or act for the public or its official representatives, are full of impressive hints, suggestions, and theories as to the identity of the criminal; but without some

7. Same.

showing of authority on their part to speak or act for the state their sayings are the merest hearsay and their conduct is without relevance or materiality as evidence in the case. The court did not err in ruling out the offered testimony.

V.   Next to his insistence that the evidence in the record makes no case against him, defendant's argument is most largely directed to the claim that by the misconduct of the county attorney and his associate prosecutor in the conduct of the case and in argument he was deprived of the benefit of a fair trial.

8. NEW TRIAL: misconduct in argument.

Again it is necessary to say that the number of and extent of the quotations made from the state's argument to the jury and the discussion thereof covering more than one hundred pages of the printed brief are such as to forbid a restatement here of all the alleged objectionable matter. It is doubtless true that in the heat of contest counsel for the prosecution pressed the defendant with much zeal and earnestness, assailed his alibi, and minimized the character and value of the evidence adduced in his behalf. In so doing they sometimes displayed a lack of charity and put the worst and most unfavorable construction upon the testimony and conduct of witnesses for the defense. But within reasonable limitations these things, however objectionable from an ethical standpoint of view, do not constitute grounds for setting aside the verdict of the jury. The mistaken notion that violence of objurgation is argument is too deeply rooted to be wholly eradicated, and, if no verdict can be permitted to stand where counsel for the successful party has indulged in any degree in unnecessary or unkind reflection upon the opposing party and his witnesses, then no case will ever be finally settled. Something must be left to the good sense and manly fairness of counsel themselves, as well as to the discretion of the trial court, to keep this tendency within bounds. Moreover, jurors must be supposed to have some capacity to distinguish between the fury and fustian of partisan oratory and the rational analysis of testimony. This is especially true when, as in this case, the

defense is in charge of vigilant, able, and experienced counsel competent to point out the weaknesses and defects in the attack made upon his client.

Within reasonable limitations each side must be allowed to conduct its case in its own way; the court being charged with the duty of preserving decorum and observance of the settled rules of procedure. It cannot undertake to pass upon the logical soundness of all argument addressed to the jury. Defects of argumentation and reasoning when apparent carry with them their own antidote, and, where the poison is more subtle, it may be safely left to opposing counsel to deal with. This liberty is, of course, not to be enlarged into unbridled license of defamation and abuse, and, with a single exception hereinafter mentioned, we find nothing in the argument of the state which seems to approach this extreme. The limits upon the time and space we can give to this matter forbid our doing more than to illustrate the nature of the criticism made by defendant's counsel. In the course of their arguments the county attorney and his associate said of a witness that he "stands alone," or is "uncorroborated," or words to that effect, when it is contended for defendant that two or more or perhaps many witnesses testified to the same effect. This is said to be an abuse of privilege or misconduct to the prejudice of defendant. We cannot so hold. If counsel made misstatements of that nature knowingly, it was of course unprofessional; but the mere fact that one who undertakes, orally and within a few hours, to discuss the testimony of more than a hundred witnesses, states incorrectly the number of witnesses testifying to a given fact, is not *per se* evidence of bad faith, and, as the truth of the statement must be tested by the memory of twelve jurors and the challenge of opposing counsel, it appears, certain that no material prejudice could result therefrom to the defendant.

Again it is complained that counsel in argument to the jury criticised the defendant for not disclosing and relying on

his alibi at the preliminary examination and argued there-from that this feature of the defense was an afterthought. The exception cannot be upheld. It is true that defendant had the legal right to withhold his defense until put upon trial, and the mere fact that he chose to remain silent at the preliminary examination was not admissible in evidence as tending to show guilt, and, had the request been made, the court might well have so instructed the jury; but the fact was before the jury as a part of the record and history of the case, and as such it was competent for counsel to discuss it and draw therefrom such inferences as they believed to be right, and this was none the less true although their deductions and inferences were unsound.

9. SAME.

Of other objections to the argument there is but one which we think has fair support in the record, and this instance, for reasons which we shall suggest, we hold to have been without substantial prejudice. As we have already said, several witnesses residing in Chicago testified to the fact that defendant was in Chicago during all the week in question up to an early hour of Thursday morning. Among these witnesses was one Mrs. Miller, a woman of unblemished character so far as appears from the record. Discussing the evidence thus produced, counsel for the state sought to discredit its value by pointing out alleged discrepancies in the stories of the several witnesses, and in connection therewith indulged quite unnecessarily in a covert suggestion or insinuation reflecting upon the character of Mrs. Miller. There was no just occasion for the language, and it should not have been used. No doubt, counsel themselves will agree that this criticism is just. But it was not a circumstance which requires the state to be penalized by an order for a new trial. While the imputation was a discourtesy to the witness and an indirect reflection upon the defendant, we cannot conceive it possible that the verdict was in any manner influenced thereby. If the defendant's presence in Chicago up to Thursday morning was an important fact in the theory of the de-

10. SAME.

fense, its proof did not depend on this witness alone. At least three or four other unimpeached persons testify to substantially the same matter, and, even if Mrs. Miller was in any manner discredited, we cannot presume that the jury disregarded the testimony of the others. On the contrary, as defendant's presence in Chicago until after midnight of Wednesday was not necessarily inconsistent with his presence in Orchard on Thursday afternoon and Friday, it was easily possible for the jury to have given the story of Mrs. Miller full faith and credit and yet have returned a verdict of guilty. There is no room, we think, for presuming the possibility of prejudice to the defendant because of this episode in argument.

And this we must say, also, as to other exceptions taken to the state's argument to the jury.

VI. Directly and indirectly counsel for the defense impugn the fairness and impartiality of the judge presiding at the trial. The record does not sustain the charge, and we give brief space to the notice of the criticism only because of the apparent sincerity and earnestness with which it is made. It is not often that the record of a trial of great length, covering such a period of time, with innumerable questions and objections arising at every step of its progress calling for prompt decision, presents fewer points upon which to lodge exceptions to the judicial fairness of the court than are found in this case. It may be, and we think is true, that at times and upon some close questions ruled against the defendant the holding might well have been the other way, but in no instance called to our attention do we see any indication of disposition on the part of the court to be otherwise than perfectly fair in its rulings and manner of conducting the trial. Unusual latitude was given the defense in summoning and examining witnesses, scores in number, some of whom were brought from other states. Cross-examination of the state's witnesses was pursued with great minuteness and to great length. So far as we

11. TRIAL: judicial unfairness: evidence.

can see, no avenue of legitimate inquiry into the truth of the matter appears to have been arbitrarily closed or obstructed by the court. If at times the court intervened with a remark looking to the limitation of excursions into collateral or irrelevant matters and hastening the trial to its termination, it did not exceed its proper power or duty in doing so. That it was not arbitrary or unreasonable in this direction is demonstrated by the immense record before us.

VII. But few exceptions to the instructions are argued. It is said, however, the court erred in telling the jury that "to be entitled to weight" the testimony in support of an alibi must be such as to show that at the very time of the commission of the offense the defendant was so far away he could not be present at the scene of the crime. The quoted phrase "to be entitled to weight" is an unfortunate one, and in some cases might be properly criticised as misleading, if not clearly erroneous; but the court in the same connection told the jury that if upon a fair consideration of the whole evidence, including that part pertaining to the alibi, there was a reasonable doubt of defendant's guilt, he should be acquitted. Taking the whole paragraph together, we are of the opinion that it states the true rule of alibi as is well settled in our prior holdings on that subject. *State v. Whitbeck,* 145 Iowa, 39; *State v. Hatfield,* 75 Iowa, 596.

12. CRIMINAL LAW: alibi: instruction.

In the eighteenth paragraph of its charge the court instructed the jury that in reaching its verdict it was not to be influenced "by any feeling of excitement or prejudice in the community, which has less reliable knowledge of the facts and less legal and moral responsibility than you have acting upon your oaths." The court further reminded the jury that the investigation was to be conducted "looking only to the evidence produced before you here and actuated by one motive only, that of doing entire justice under the evidence and the law given you by the court." Exception is taken to the language first above

13. SAME: instructions: prejudice of community.

quoted where reference is made to public excitement and prejudice. This is said to imply liberty on the part of the jury to take into consideration public feeling and public prejudice if the jury believed it to be based upon as reliable knowledge of the facts as the jurors themselves had. The objection savors of extreme hypercriticism. The instruction was clearly intended as a safeguard of the defendant's right to have a verdict returned upon the evidence and the evidence alone, uninfluenced by popular clamor or public sentiment. In the twenty-fifth paragraph of counsel's statement of points he says the jury were told it was not to be influenced by any public "excitement which had less reliable knowledge," etc., omitting the words "in the community," which the court employed immediately after the words "excitement or prejudice," thereby radically changing the effect of the instruction. The pronoun "which," as used in the instruction, clearly relates to the "community," but as used in counsel's attempted paraphrase of the instruction it is made to relate to "excitement or prejudice," and in this manner only could an unfavorable meaning or effect be extracted from the instruction. The caution thus given the jury was not only without prejudice to the defendant, but if, as counsel say, the defense was handicapped by the existence of an adverse public sentiment in that community, the direction so given was distinctly favorable to the defense.

It is finally said that the court erred in telling the jury that the indictment charged an assault with intent to rob. This point is made upon the fact that the instrument as written alleges that defendant committed an assault upon E. O. Clapper with intent to rob, but does not follow such charge with words indicating what person he intended to rob or the ownership of the property which was to be the subject of such intended robbery. It is true we have held an allegation of the ownership of the property is necessary in an indictment for robbery (*State v. Wasson*, 126 Iowa, 323), but

14. SAME: assault with intent to rob: indictment: waiver of objection.

it does not follow that like particularity is necessary in an indictment for assault with intent to rob. The offenses are quite distinct. One is an invasion of a property right and the other an invasion of a right of person. The gist of robbery is the wrongful taking of the property of another under certain circumstances of aggravation, and an allegation of the ownership of the property is necessary to make the charge complete and intelligible. In the other case the overt criminal act is the injury or attempted injury of the person of another, and, for reasons already stated, an allegation of the name of the person assaulted is essential to a complete charge; but, the intent having reference only to the mental attitude or purpose of the assailant, it is sufficiently expressed in alleging it in general terms.

But whatever be the merit of this distinction, it is to be noted from the record that the defendant went to trial without raising any objection to the indictment, and under a recent statute this would seem to operate as a waiver of the defect even if a timely objection thereto might have been well taken. See chapter 227 of the Laws of the 33d General Assembly.

VIII. Coming now to the defendant's motion for a new trial, we have to say that most of the points there made are governed by the conclusions we have already announced, and further reference to the matter thus disposed of is unnecessary. Of matters not yet considered, we may mention the claim of newly discovered evidence. It is well settled in our practice that newly discovered evidence is not a recognized ground for new trial in criminal cases, though we have held that such an order may be made where it is discovered that false evidence of a material character has been given in support of the prosecution. *State v. Foster*, 91 Iowa, 178. The new evidence alleged to have been discovered does not bring the case within the exception recognized in the above cited precedent. It may be conceded, as counsel says, that the discovery of cumulative evidence in support of an alibi has sometimes been given

15. SAME: new trial: newly discovered evidence.

weight in support of a motion for new trial. But this, we think, is in cases where the new testimony, though cumulative, in effect, is of facts and circumstances not known or considered on the first trial. Here, however, the discovery is not so much of new evidential facts as of new witnesses to the same facts which have already been presented to the jury and passed upon in reaching its verdict. There is also some claim of new evidence tending to impeach certain of the state's witnesses. So far as we are able to discover from the record, the impeaching testimony was within easy reach of the defendant and could have been produced by him with reasonable effort had he deemed it of any value. Taken altogether, the showing of new evidence was insufficient to require an order for new trial, and there was no error in overruling the motion.

We are also urged to set aside the verdict because public prejudice against the defendant at or about the time of the trial was such as to prevent the due administration of justice and deprive him of a fair and impartial hearing. We may for the purposes of the case assume that public opinion in that community was against the defendant, and it is more than possible that this was reflected in the demeanor and bearing of the attendant crowd of spectators; but there is nothing to show any demonstrations of a character to intimidate the jury or to indicate that the verdict was anything other than the honest conclusion of the several jurors acting in accordance with what they believed to be their duty. It is perhaps unfortunate that the trial of an important case draws to the courtroom a crowded audience of people upon whose faces and in whose bearing an observant juror may read the trend of popular sympathy. But this is something of which in the very nature of things juries cannot be kept in ignorance. The safeguard of an accused person under such circumstance is to be found in the selection of a jury of men of such character and such just conception of their obligation that they will not permit their verdict to be influenced by these extraneous circum-

16. SAME: new trial: public prejudice.

stances. Generally speaking, it is not in the nature of the public mind to be indifferent or impartial concerning any alleged crime of a serious character, but such fact affords no ground for interference with a verdict returned, unless it be made to appear in some affirmative way that this sentiment has invaded the jury room and influenced the finding there reached. We find nothing of that kind in this case.

It is said, however, that certain improper influences were brought to bear on the jury. This is supported by the affidavit of the court reporter that one Patek, a detective for the Bankers' Association, said in Osage pending the trial that defendant as an actor had played the part of a character known as "Gains" in some drama presented by the company with which he had been connected. A juror, one Graves, also makes affidavit that during the trial he heard the story from some source and also heard that defendant had at some time been suspected of stealing money. He says, however, that these statements were not addressed to him, but were accidentally overheard by him on the public street, and he gave them no consideration or weight whatever in reaching his verdict, and that he did not repeat the same to any of his fellow jurors. He further says that such alleged facts were not mentioned or discussed in the jury room. The statement of another person that the juror Woolverton expressed an opinion of defendant's guilt before the trial was over is denied by that juror. There are other affidavits that the complaining witness Clapper was seen in conversation with one or more of the jurors during the pendency of the trial, and that in one or more instances a business matter of some kind was mentioned in an incidental way between Clapper and a juror. Some of these statements are denied by the parties named, and in others are so explained as to fairly rebut the inference or suspicion of any attempt to improperly approach or influence the jurors mentioned. Some other circumstances are relied upon, but are not of such character or importance as to add weight to the

17. SAME: new trial: misconduct of jurors.

charge that the verdict was vitiated by misconduct of the jurors or of the prosecuting witness.

We are quite conscious that this opinion inadequately reflects the record in its entirety. If we have left certain features of the testimony unmentioned and certain points of argument undiscussed, it is not because we have failed to consider them, but because the mass of material laid before us is such that we are forced to omit specific notice of the matters and things which appeal to us as being of minor importance. In final analysis the appeal turns almost entirely upon the single question whether the testimony is sufficient to sustain the verdict of guilty. As we have already said, if the veracity of the state's witnesses is conceded there can be no doubt of the defendant's guilt, and, as the credence and weight to be given their testimony were for the jury alone, its finding cannot be disturbed.

The judgment of the district court is therefore *Affirmed.*

LADD, DEEMER, GAYNOR, PRESTON, and WITHROW, JJ., concur. EVANS, J., absent.