# IN THE SUPREME COURT OF IOWA

No. 14–1615

Filed April 15, 2016

Amended June 21, 2016

**STATE OF IOWA,**

　　Appellee,

vs.

**MARK GABRIEL MARTIN,**

　　Appellant.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Cerro Gordo County, Christopher C. Foy, Judge.

A defendant in a criminal case contends the district court should have declared a mistrial or granted a new trial because the prosecutor repeatedly exceeded the scope of permissible voir dire questioning and thereby tainted the entire jury pool. **COURT OF APPEALS DECISION AND DISTRICT COURT JUDGMENT AFFIRMED.**

Sarah A. Reindl, Mason City, for appellant.

Thomas J. Miller, Attorney General, Heather R. Quick (until withdrawal) and Tyler J. Buller, Assistant Attorneys General, Carlyle Dalen, County Attorney, and Blake Norman and Steve Tynan, Assistant County Attorneys, for appellee.

**HECHT, Justice.**

A prosecutor conducting voir dire posed hypothetical questions closely approximating the facts of the case, intimated the State possessed additional evidence supporting guilt but could only present some of it, and delivered a lecture that implied the State only prosecutes guilty people. The record does not establish whether the prosecutor's questions were calculated or simply unartful, but the district court concluded they ventured into a gray area. Likewise, the court of appeals concluded the prosecutor's questions teetered on the line between proper and improper. Despite those concerns, neither court granted the defendant a new trial because each court concluded the remarks did not cause juror bias or make the trial unfair. On further review from the court of appeals decision, we examine whether the prosecutor improperly strayed too far from permissible voir dire. In part because Martin did not object in the district court to all the statements he challenges on appeal, we conclude the prosecutor did not cross the line. We therefore affirm.

## I. Background Facts and Proceedings.

After his arrest for shoplifting deodorant, criminal suspect Jeremy Collins offered to "work off" his theft charge by helping police apprehend narcotics distributors. He gave officers several names, including Mark Martin, and asserted he could buy methamphetamine from those people. Collins knew Martin because he previously lived in Martin's home. Collins signed an agreement to become a confidential informant and, with his help, police arranged a controlled buy at Martin's home in Mason City.

Collins went to Martin's home wearing a concealed audio recording device and carrying marked currency police had given him. Martin was not there when Collins arrived, but at least three other people were,

including Martin's son. Eventually Martin arrived, and soon thereafter, Collins returned to his rendezvous point with police, no longer possessing the marked bills and instead carrying a small baggie containing methamphetamine. Accordingly, the State charged Martin with delivering methamphetamine. Martin pled not guilty and the case proceeded to trial.

Martin's defense theory disputed identity. Based on his review of the audio recording from the concealed recording device, Martin acknowledged a transaction occurred, but he contended the recording did not establish he personally knew anything about it. Instead, Martin asserted, one of the other people present in his home that day consummated the transaction and delivered methamphetamine to Collins, either outside the house or while Martin was out of earshot and in another room.

During jury selection, the district court asked questions first. After finishing its own examination but before allowing the prosecutor to ask more questions, the court told the panel:

> [W]hile the attorneys may talk a little bit about the types of issues they think you'll be required to deal with in serving as a juror, they're not to be telling you about the facts of this case. Attorneys are not witnesses. Any evidence in this case will be presented from the witness stand . . . .

During the State's voir dire, the prosecutor asked several questions and made comments that Martin asserts were intended to condition the jury to believe and support law enforcement officers. First, the prosecutor questioned a prospective juror who indicated she knew Investigator Frank Hodak, one of the expected witnesses:

> Q: What's your overall feeling of Mr. Hodak? A: I don't know him any more.

Q: Okay. But he was a good guy I guess whenever you knew him? A: He was back then. Yes.

After this exchange, the prosecutor asked another prospective juror about his general impressions of law enforcement and his familiarity with Officer Lakose, another possible witness:

Q: [What are] your thoughts on law enforcement? A: I have a daughter in law enforcement and a son-in-law in law enforcement.

Q: Oh, okay. And so obviously they're good—good hard working people; right? A: Correct.

Q: All right. Raised them right.

. . . .

Q: And you know Officer Lakose? A: Yes.

. . . .

Q: How do you know Mr. Lakose? A: Friends. We've known each other for many years.

Q: Okay. Go hunting together or—? A: No.

Q: Okay. Didn't know. Are you a hunter? A: Yes. But I don't think [Officer Lakose] does.

Q: I actually—knowing [him], I don't know if he would do too well hopping the fences. But he's a pretty good guy that you know? A: Yes.

Martin contends referring to each of the potential witnesses as a good guy and commenting that a prospective juror with children in law enforcement "raised them right" are subtle cues intended to implant the notion that police are always the good guys and defendants like Martin are the bad guys.

Next, the prosecutor embarked on a discussion about general impressions of police honesty that transitioned into informing—not asking—two prospective jurors about notions of police accountability:

Q: And do you think there's certain procedures though that kind of safeguard that officers can't overstep their bounds?  A: We hope so.

Q: Okay.  Well we have public accountability is one of them.  A: Uh-huh.

Q: And we also have the jury system.  A: Uh-huh.

Q: We also have me as the County Attorney.  I don't know if many of you know this but the County Attorney is actually the chief law enforcement officer for the county.  A: Okay.

Q: So he's in charge of some of the administrative.  So I didn't know if you know that.  In fact, I don't know if many of you know kind of what the County Attorney's office is.  We actually don't work—we work and represent the State.  But we're actually—it's an elected office for the county.  So you, as a citizen of Cerro Gordo, get to elect who is the prosecutor for Cerro Gordo County.  I don't know if any of you knew that.

. . . .

Q: And do you vote for the County Attorney or do you not or do you just—  A: No, I didn't.

Q: Okay.  Okay.  Some people don't and that's why I didn't know if you just voted the main elections.  Okay.  But do you understand that in some ways my office is bound to serve Cerro Gordo citizens?  A: Yes.

Q: So if I do something wrong and it represents badly on my boss, that he's actually accountable to you as a citizen if I do something wrong.  A: Yes.

Q: So you have the power actually to vote me out of my position as a citizen.  Which I like my job.  So please don't.

After informing the jury that prosecutors are accountable to voters,[1] the prosecutor turned to the burden of proof, exploring the

---

[1]Beyond any implications these statements made about the strength of the State's case, one of them is also factually incorrect.  County attorneys are elected officials, but assistant county attorneys like the one who tried this case are appointed.  *Compare* Iowa Code § 331.751(1) (2013), *with id.* § 331.757(2).  Thus, the citizens of a county do not actually "have the power . . . to vote" assistant prosecutors out of jobs they like.  Instead, such an assertion arises from mere anticipation that a newly elected

definition of reasonable doubt and probing with the prospective jurors their expectation about how much evidence they would see and hear:

> Q: I cannot as [the] State give you every ounce of evidence that you want. There's all sorts of rules why. The judge is the one that determines what's admissible. We have the rules of evidence. Rules of evidence that determine by either statute or by court rules what is available for you as the fact finder to determine. Now, I'm going to try to give you all the evidence that I have available that is admissible. Now, [prospective juror]? A: Yes.

> Q: Does that kind of make sense that I have only so much evidence that I can actually give you? A: Yeah.

> Q: And even some of that evidence I may have will not be admissible. A: If [the judge] says it's not, yeah.

> Q: Yeah. So what happens if you're wondering, well, why didn't he tell me this; why didn't he give me—the guy, has he committed any other crimes; is this guy a good person; give me some—you know, what's his reputation? If I don't give you any of that, are you going to hold that against me? A: Oh, no.

Defense counsel did not lodge an objection on the record or request a bench conference at any point during these exchanges.

The last line of questioning Martin asserts was improper involved the prosecutor asking jurors to imagine themselves as drug dealers in Mason City and further imagine how they would choose their customers. The prosecutor specifically confirmed with a prospective juror that, if the juror were a drug dealer, he would want to know his customers, so it made sense that police might want to apprehend drug dealers with help from a drug user or previous customer. The prosecutor also asked jurors if they would consider a confidential informant untrustworthy just because he or she aided police pursuant to an agreement that would also

---

county attorney might decide to revamp the roster of lawyers staffing the county attorney's office—a speculative assumption that does not always happen in practice.

benefit them. Finally, the prosecutor asked if hearing an audio recording of an alleged drug transaction would "help [jurors] know exactly what happened." Because Collins wore a concealed recording device during the controlled buy, the resulting recording was a key piece of evidence the State later introduced.

Defense counsel twice requested a bench conference during this last line of questioning about choosing customers for drug transactions and audio recordings of drug transactions. Although voir dire was reported, the dialogue in the bench conferences was not. However, after each conference concluded, the prosecutor redirected his questions. The court did not expressly instruct the prospective jurors to disregard the line of questioning generating the bench conference in either instance. The State passed for cause on the jury pool at the end of that day's proceedings, and the court recessed the proceedings for the day.

Before beginning voir dire the next day, Martin's counsel moved for a mistrial, contending the prosecutor's improper questions tainted the whole panel of prospective jurors. The motion challenged four specific categories of inquiry the prosecutor pursued the previous day: (1) questions specifically about Investigator Hodak, including whether he was a good guy; (2) asking a prospective juror to imagine she was a confidential informant; (3) asking a prospective juror to imagine he was a drug dealer; and (4) asking a prospective juror about the weight they would give a surreptitious audio recording. In supporting the requested relief, Martin's counsel attempted to reconstruct for the record the substance of the two earlier bench conferences:

> I first asked to approach the bench when [the prosecutor] was asking a juror to put herself in the place of a confidential informant. At that time he had already asked another juror to become a dealer and asked the juror who he

would sell to. And prior to that, he was asking specific credibility questions about a witness. In fact, he asked is he a good guy. Referring to Frank Hodak.

I think that's clearly improper. He was trying to establish the credibility of the witness, not look for bias or prejudice. By how people thought of police officers in general—which would be clearly permissible.

After the Court admonished [the prosecutor] to move on, after the first conference, he then started talking about the tape and money to another potential juror. I asked to approach the bench again because that was clearly improper, and the judge again advised him to move on.

Martin's counsel did not assert the prosecutor's questions about Officer Lakose or statements about the prosecutor's electoral accountability supported the mistrial motion.

The State resisted the motion, contending the challenged questions were permissible and the court had appropriately limited or redirected questioning when the inquiries came close to the line. Questions about specific witnesses, the State asserted, were designed to ferret out bias either for or against them, not bolster their credibility. Similarly, the State contended the hypothetical questions were not prejudging the case's facts because they did not use specific names or refer to specific instances at issue. Finally, the State asserted if the jury panel *had* been tainted, Martin could rehabilitate the panel members through his counsel's own voir dire. *See State v. Gulliver*, 163 Iowa 123, 138, 142 N.W. 948, 954 (1913) ("Defects of argumentation and reasoning when apparent carry with them their own antidote, and, where the poison is more subtle, it may be safely left with opposing counsel to deal with.").

The district court concluded questions about specific witnesses went "a little further than talking about just general opinions of law enforcement." The court also observed that the prosecutor's hypothetical questions about drug sales encroached "a little too much into testing

how a prospective juror . . . might view the facts of the State's case." However, the court denied Martin's motion for mistrial because it did not want to "call undue attention to the concerns" and because it believed Martin could adequately address any issues through his counsel's own voir dire. Nonetheless, before allowing Martin's counsel to begin, the court reminded the prospective jurors that "during voir dire the attorneys are not suppose[d] to discuss the facts of the case . . . [or] have you guess as to what the law is."

After Martin's counsel examined the panel and passed for cause, the parties exercised peremptory strikes. Three of the panel members involved in the exchanges reproduced above were selected as jurors; two were not. The jury heard the evidence, including the audio recording. Collins also testified, stating Martin—not any of the other visitors to Martin's home—delivered the methamphetamine. Before the jury began deliberations, one of the court's instructions reminded the jury that "[s]tatements, arguments, questions and comments by the lawyers" are not evidence. The jury returned a verdict finding Martin guilty of delivering methamphetamine.

Martin filed a motion in arrest of judgment and motion for new trial, renewing the claim of error[2] during voir dire and asserting several other grounds for a new trial. The court denied the motion on each asserted ground. With regard to the asserted voir dire errors, the court concluded the State's questions, while troubling, were not so inflammatory as to deny Martin a fair trial. In addition, the court reasoned that any prejudice resulting from the prosecutor's questions

---

[2]We use the word "error" here (instead of "misconduct") to avoid automatically implying that the prosecutor violated our ethical rules.

and statements was mitigated by several jury instructions given before and after voir dire reminding the jury that attorneys' statements and arguments are not evidence.

Martin appealed, asserting multiple errors, including the prosecutor's voir dire questioning, justified a new trial.[3] The court of appeals affirmed Martin's conviction, but noted "the prosecutor's approach to voir dire . . . skated on the line of impropriety." Martin sought further review, asserting that affirming his conviction would embolden prosecutors to push the voir dire envelope even further in future cases. We granted his application to determine whether the prosecutor's questions toed the line, crossed it incrementally, or barreled through it entirely. *See State v. Tolson,* 248 Iowa 733, 734, 82 N.W.2d 105, 106 (1957) ("It is sometimes said that error 'crept' into the trial of a lawsuit. Not so in the case at bar. It marched in like an army with banners, and trumpets.").

## II. Scope of Review.

"Control of the [voir dire] process is lodged in the discretion of the trial court . . . ." *State v. Windsor,* 316 N.W.2d 684, 686 (Iowa 1982). Accordingly, we review Martin's claim of error during voir dire for an abuse of discretion. *See State v. Tubbs,* 690 N.W.2d 911, 915 (Iowa 2005) (applying an abuse-of-discretion standard when the defendant claimed the court improperly allowed several voir dire questions); *Windsor,* 316 N.W.2d at 685–86 (applying an abuse-of-discretion standard when the defendant claimed the court improperly restricted voir dire questioning and interjected its own comments).[4]

---

[3]Martin's appellate counsel did not represent him at trial.

[4]Although defense counsel did not couch the mistrial motion in constitutional terms and did not mention any provision of either the United States Constitution or the

**III. Analysis.**

Before the court of appeals, Martin raised several grounds for granting a new trial; asserted error during voir dire was just one of them. In his application for further review, Martin focused solely on the voir dire questioning. "When we consider an application for further review, our discretion allows us to review any issue raised on appeal, regardless of whether a party seeks further review of that issue." *State v. Bogan*, 774 N.W.2d 676, 679 (Iowa 2009). However, in this case we let the court of appeals decision stand as to Martin's other asserted grounds for new trial and address only the assignment of error arising from the voir dire. *See State v. Gathercole*, 877 N.W.2d 421, 426 (Iowa 2016) (limiting review to one issue even though the defendant initially raised multiple challenges on appeal).

**A. Error Preservation.** On appeal, Martin aggregates several portions of the voir dire as support for his overall claim that the prosecutor crossed the line. However, trial counsel made no objection to some of the statements now raised on appeal, and we therefore conclude Martin did not preserve them for our review.

Our research reveals some authority condemning statements and lines of questioning that place the weight of the prosecutor's office behind the legitimacy of the state's case or the theory supporting guilt. For example, in *Lainhart v. State*, the court granted a new trial when "the prosecutor's remarks [during voir dire] constituted improper indoctrination, vouching, and commentary on the justness of the cause."

---

Iowa Constitution, the district court understood Martin's objection to be that continuing with the same jury panel would deprive him of his right to a fair trial. However, neither party asserts on appeal that Martin made a constitutional claim or that our review is de novo. Accordingly, we leave for another day the question whether claims like Martin's necessarily feature a constitutional dimension justifying de novo review.

*Lainhart v. State*, 916 N.E.2d 924, 938 (Ind. Ct. App. 2009). And in *Foster v. State*, the prosecutor embarked upon a screed detailing "the entire scheme and procedure of sentencing." *Foster v. State*, 436 N.E.2d 783, 786 (Ind. 1982). The court concluded this lecture about the legal system exceeded the scope of permissible voir dire because the subject matter would "not assist the jury in fulfilling the serious responsibility assigned to it[:] to determine the guilt or innocence of the defendant based solely upon the evidence presented at trial." *Id.* The court granted a new trial because the civics lesson went too far afield and may have created "misconceptions in the minds of the jurors" suggesting they should decide the case a certain way because of how the system works. *Id.* at 786, 788.

Here, the prosecutor's civics lesson reminded the prospective jurors that the county attorney is an elected supervisory law enforcement officer working for them—the residents of the county. The lesson invited jurors to infer that they could rely on the prosecutor to present reliable evidence because he is accountable to them as voters. *Cf. Lainhart*, 916 N.E.2d at 937 (concluding it was improper for the prosecutor to suggest police officers would testify reliably because "they'd be putting their badge at risk" if they didn't). In other words, intentional or not, the prosecutor subtly suggested he and the potential jurors were on the same side and he would not lead them astray because doing so might cost him his job. *Cf. State v. Musser*, 721 N.W.2d 734, 756 (Iowa 2006) (concluding a prosecutor giving closing argument "inappropriately diverted the jury from its duty to decide the case solely on the evidence by . . . making predictions of the consequences of the jury's verdict").

Similarly, the prosecutor's statement about evidence the State "may" have, but that was inadmissible, was troublesome because it

"suggests that information not presented to the jury supports the [expected] witness[es'] testimony." *State v. Vincent*, 768 P.2d 150, 155 (Ariz. 1989) (en banc). "We have some difficulty in understanding why prosecutors and lawyers of standing will take chances by making statements upon which the claim of [error] may be made . . . ." *State v. Browman*, 191 Iowa 608, 634–35, 182 N.W. 823, 834 (1921). We do not decide, however, whether Martin suffered prejudice from the prosecutor's civics lesson or the implication that the State had incriminating evidence it could not present to the jury. Defense counsel did not object to these statements or raise them as grounds for a mistrial below. *See Reynolds v. State*, 114 So. 3d 61, 147 (Ala. Crim. App. 2010) (finding no prejudice in part because the defendant "did not object to any of the allegedly improper comments"); *People v. Shipman*, 747 P.2d 1, 3 (Colo. App. 1987) (concluding some of the prosecutor's voir dire questions were improper but declining to grant a new trial because the defendant did not make a timely objection); *cf. Foster*, 436 N.E.2d at 788 (granting a new trial when the defendant lodged a "timely and continuing objection" to an irrelevant lecture about the legal system but the trial court overruled it). Accordingly, we cannot review them on appeal because we have repeatedly declined "to abandon our preservation of error rules in favor of a discretionary plain error rule." *State v. Hutchison*, 341 N.W.2d 33, 38 (Iowa 1983); *see also State v. Rutledge*, 600 N.W.2d 324, 325 (Iowa 1999); *State v. McCright*, 569 N.W.2d 605, 607 (Iowa 1997). Instead, we review only the questions that Martin asserted as grounds for mistrial in the district court. *Cf. State v. Prusha*, 874 N.W.2d 627, 630 (Iowa 2016) ("Prusha never apprised the district court that he believed the search violated [the state constitution]. . . . Accordingly, we only address Prusha's Fourth Amendment claims.").

**B. Voir Dire Principles.** We described long ago the purpose of conducting voir dire:

> It is the general and well-established practice to allow both to the state and to the defendant considerable latitude in the examination of persons called to act as jurors, not only to facilitate the discovery of grounds for challenge for cause, but to enable the parties interested to discover any peculiarity of conduct, association, character, or opinion, or any predilection, of the person under examination, or other circumstances which, in the opinion of the examiner, might influence the person as a juror, and affect his [or her] verdict. It is well known to persons familiar with jury trials that jurors are frequently influenced in reaching a verdict by considerations which have no legitimate application in the case. The right of peremptory challenge gives the means of keeping from the jury persons of that kind, which the challenge for cause does not afford; and parties should be permitted to examine persons called to act as jurors, within reasonable limits, to the end that the peremptory challenges may be used intelligently.

*State v. Dooley*, 89 Iowa 584, 588, 57 N.W. 414, 415 (1894). Put another way, "[t]he objective of voir dire is to gather sufficient information for the exercise of challenges" and otherwise "secure a fair and impartial jury." *Windsor*, 316 N.W.2d at 687.

Those two purposes are limited: "Voir dire is not designed for educating jurors on the law or for persuading them on the merits of the case." *Id.* Nonetheless, lawyers receive considerable leeway in questioning prospective jurors. *Tubbs*, 690 N.W.2d at 915; *Dooley*, 89 Iowa at 588, 57 N.W. at 415.

Our appellate courts have decided only a few cases addressing allegedly improper voir dire questioning. For example, in 1975 we reviewed a defendant's challenge to a prosecutor's use of two leading questions preemptively attacking the defendant's alibi. Although we declined to "place the stamp of approval upon" the questions, we found

no abuse of discretion in the district court's decision to deny a motion for mistrial. *State v. Menke*, 227 N.W.2d 184, 187 (Iowa 1975).

In *State v. Hunt*, a defendant contended a single question using a hypothetical that matched the facts of the case justified a mistrial. *State v. Hunt*, 801 N.W.2d 366, 371–72 (Iowa Ct. App. 2011). The court of appeals concluded the isolated question was merely "attempting to assess whether the potential juror would approach the case fairly and impartially," and did not pose a great risk of prejudice because "the hypothetical was actually favorable" to the defendant. *Id.* at 372; *see also State v. Ortega*, 813 N.W.2d 86, 99 (Minn. 2012) (concluding a prosecutor's questioning was permissible because it "could have aided [the defendant]'s case").

In *State v. Reed*, the court provided the prospective jurors with information they would not otherwise hear—specifically, that one potential defense witness was subject to pending criminal charges. *State v. Reed*, 482 N.W.2d 672, 673 (Iowa 1992). The court then asked the panel if "information or impressions the jurors had about that investigation would make it difficult for them to be fair." *Id.* Defense counsel moved for a mistrial because while "[a]cknowledging that the court's apparent purpose was merely to air any possible juror prejudice, counsel claimed the court's remarks would 'taint or poison' [the] testimony." *Id.* We concluded the court abused its discretion because it "unnecessarily enlightened the jurors about a piece of impeachment evidence that would otherwise be inadmissible at trial." *Id.* at 674. However, we found the error was harmless because the comments were brief, factual, and nonjudgmental, because the court "did not state whether [the witness] would be appearing on behalf of the State or the

defendant," and because the comment did not appear to be advocacy for either party. *Id.*

In *Tubbs*, the defendant was charged with driving while intoxicated. The prosecutor asked potential jurors questions about what symptoms they might expect to observe in an intoxicated person. *Tubbs*, 690 N.W.2d at 914–15. Counsel objected that this line of questions improperly solicited juror testimony and was not calculated to evaluate the jurors' ability to be impartial. *Id.* at 915. We concluded the questions were permissible because the prosecutor was simply "attempting to assess potential jurors' understanding of what evidence is relevant on the question of intoxication." *Id.*

**C. Applying the Principles.** Instead of one question or one brief instance during voir dire, Martin presents a handful of asserted improprieties and contends they demonstrate the prosecutor's purpose was to condition the potential jurors to trust and believe police. Additionally, unlike the hypothetical in *Hunt*, the prosecutor's hypotheticals here were not favorable to the defendant. Instead, they closely matched the facts of the case and sought the jurors' opinion whether confidential informants are trustworthy witnesses. Finally, Martin contrasts this case with *Tubbs* and asserts the questions here went beyond the permissible general inquiry allowed in *Tubbs*, venturing into improper questions about a specific witness (Investigator Hodak).

We conclude some of the challenged questions that are properly before us were permissible, and as to the others, the district court acted appropriately to prevent prejudice to Martin.

1. *Investigator Hodak.* Referring to Investigator Hodak as a good guy was, as in *Hunt*, only one question most reasonably viewed as "attempting to assess whether the potential juror would approach the

case fairly and impartially" given her previous personal relationship with Investigator Hodak. *Hunt*, 801 N.W.2d at 372. The vast majority of the prosecutor's questions about police sought the prospective jurors' general impressions and opinions about a category of possible witnesses, which is a proper subject of inquiry. Importantly, too, the juror who knew Investigator Hodak expressed during the court's voir dire that she would have no problem viewing his testimony objectively.

2. *Confidential informants.* We also conclude the prosecutor's questions probing whether potential jurors held views about the trustworthiness of confidential informants were permissible. These, too, were general questions "prob[ing] the minds of potential jurors to determine whether they had predispositions" about a case-specific category of possible witnesses. *State v. Scott*, 829 N.W.2d 458, 464 (S.D. 2013); *see also State v. Garvin*, 117 P.3d 970, 979 (N.M. Ct. App. 2005) (concluding it was permissible for a prosecutor to ask questions about homelessness "to determine whether any of the potential jurors would have refused to convict a person simply because he or she is homeless"). The district court did not abuse its discretion in declining to grant Martin's mistrial motion based on these two lines of inquiry during voir dire.

3. *Hypothetical questions matching the case's facts.* Two lines of inquiry pursued by the prosecutor and challenged by Martin remain: asking jurors to imagine themselves as drug dealers and asking whether they would be inclined to give weight to a surreptitious audio recording. "To test the qualification of persons called to sit as jurors neither party may inquire concerning . . . views of evidence to be adduced on the trial or the weight [the juror] would be inclined to attach thereto." *State v. Dillman*, 183 Iowa 1147, 1152, 168 N.W. 204, 206 (1918). Similarly,

prosecutors cannot "precondition[] the jury by arguing" the facts of the state's case through voir dire questions. *Law v. State*, 98 P.3d 181, 194 (Wyo. 2004). The challenged questions in this case steered awfully close to these shoals. However, in both instances, defense counsel requested a bench conference and the court promptly terminated the lines of inquiry. Furthermore, the court instructed the jury "[a]t least twice . . . that remarks made by the lawyers were not to be considered as evidence." *United States v. Mack*, 643 F.2d 1119, 1124 (5th Cir. 1981). We conclude these remedial efforts were adequate under the circumstances presented here and find no abuse of discretion.

**IV. Conclusion.**

Of the four lines of voir dire inquiry challenged by objection and preserved for our review, two were permissible. We conclude the district court mitigated any prejudice resulting from the two lines of questionable voir dire inquiry by promptly restricting them and by giving appropriate instructions to the jury. We find no abuse of discretion by the district court. Accordingly, we affirm Martin's conviction and both lower courts' decisions.

**COURT OF APPEALS DECISION AND DISTRICT COURT JUDGMENT AFFIRMED.**