# IN THE COURT OF APPEALS OF IOWA

No. 20-0086
Filed January 12, 2022

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**HILLARY LEE HUNZIKER,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Buchanan County, Andrea Dryer,
Judge.

Hillary Hunziker appeals her conviction for murder in the first degree.
**AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Bradley M. Bender,
Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney
General, for appellee.

Heard by Bower, C.J., and Greer and Badding, JJ.

**GREER, Judge.**

Hillary Hunziker appeals her jury conviction of first-degree murder. She asserts that (1) the district court erred in denying her request for a continuance based on the unavailability of her expert witness, (2) the jury instructions about the insanity defense did not correctly state the law, (3) her conviction is contrary to the weight of the evidence, (4) the district court erred in denying two requests for substitute counsel, and (5) she should be able to assert an ineffective-assistance-of-counsel claim on this direct appeal to pursue an unpreserved sufficiency-of-the-evidence claim, or in the alternative, we should evaluate her issue under plain-error review.

## I. Facts and Background Proceedings.

In November 2017, Hunziker; her mother, Brenda Milnes; and her young son, J.H., traveled to Minnesota for a family gathering with Hunziker's brother, Brook Milnes.[1] On the trip, she had periods of being emotional, tearful, and quiet. Hunziker and her mother dropped J.H. off with Hunziker's ex-husband, Jason,[2] who had physical care of the child. Hunziker was unhappy with this arrangement and had made several allegations about child abuse regarding both J.H. and Jason's adult son. None of the allegations were found to be credible or substantiated, and all followed moments of turmoil in the relationship. The first allegation came a few months after their divorce decree was finalized and Jason was awarded physical care. The second occurred after Jason told Hunziker that

---

[1] To avoid confusion, we will refer to Brenda Milnes by her last name and Brook Milnes by his first name.
[2] As Hillary and Jason shared a last name, we refer to Jason by his first name.

he was no longer interested in any relationship with her. And the third was voiced after Hunziker entered and refused to leave Jason's home, requiring law enforcement to remove her.

On the ride home, Hunziker told Milnes that Jason had raped her in front of both of his sons. Neither son had mentioned this to Milnes and, at trial, Jason's adult son denied seeing or experiencing any abuse. Given Hunziker's history of false allegations and her own impressions of Jason and his sons, Milnes did not find Hunziker's allegations credible. Still, by the time Milnes dropped Hunziker off at home, she was worried about her daughter's mental stability. She offered to take Hunziker to the hospital or have her daughter come stay with her. Hunziker instead asked Milnes to take J.H. up to Minnesota to live with Brook if anything were to happen to both Hunziker and Jason. Still concerned, Milnes told her daughter to go to bed and then went home.

Hunziker did not go to bed. Instead, she went to Walmart and bought two flashlights, two knives, and razor blades. She released her dogs and cat so someone else could find them and take care of them. She put a sleeping bag in the backseat of her car as a makeshift bed. She filled her tank with gas. She put on boots she believed would be quiet. Then, around 4:00 a.m., she entered Jason's home, avoided squeaky floorboards, and packed a bag with toys for J.H. With a knife held in her right hand, she found Jason sitting in his bed. The two exchanged words, and she stabbed him. Jason called out to J.H., and Hunziker yelled for him to stay in his room. However, the child did not—instead, he called

911[3] and told them his mom had stabbed his dad. Hunziker stabbed Jason twenty times, pulling down his underwear to keep him from running. She then corralled J.H., who was screaming and crying, into the car. Jason was also able to call 911 on his cell phone and reported that his ex-wife had stabbed him and taken his child and that he was dying. By the time help arrived, he had lost too much blood from major arteries that were severed. Jason died soon after.

After fleeing the scene, Hunziker called Milnes and threatened to drive through the garage door if Milnes did not open it for her. She said something like "artery, artery," and Milnes replied, "Hillary, what have you done?" Milnes then called the police.

Officer Patrick Kremer arrived at Milnes's home just as Hunziker did. Hunziker was covered in blood and had what her mother described as a "wild" look. When Officer Kremer saw Hunziker coated in blood, he asked her what was going on. She responded that she was dressed for Halloween. Officer Kremer asked for Hunziker's name. Instead, she told him that she was going to tell him the truth: her son had been living with his father, who was a child molester, and so she killed him. Officer Kremer saw J.H. standing next to her without a shirt, also speckled with blood. Hunziker told the officer that J.H. did not like to talk about it; J.H. whimpered and said he loved his father. Hunziker was calm and responsive, confirming again that she had killed Jason. Officer Kremer handcuffed Hunziker and asked Milnes to take J.H. inside.

---

[3] The 911 call was entered into evidence. Phrases such as "I won't hurt you," "move," and "stop crying" can be heard.

Officer Kremer found a knife in Hunziker's front right pocket and its sheath hung around her neck. The flashlights, razor blades, and other knife were found in her car. Officer Kremer also noticed that her hands were cut. Hunziker told him that she wanted her son to go live with her brother in Minnesota. As Officer Kremer took her to the squad car, she told him, "It's a crazy world out there," and then, "You gotta do what you gotta do." He placed her in the squad car, read her *Miranda* rights, and called for an ambulance. When Officer Kremer asked if Hunziker wanted to talk about the incident, she responded, "Not right now."

At this point, Officer Mark Keeney arrived at the scene. It was decided that he would ride in the ambulance with Hunziker. Officer Keeney wore a body camera that recorded the trip, but he had been instructed by an Iowa Division of Criminal Investigation (DCI) agent to not try and speak with her about the case. Hunziker, however, spoke with someone else in the ambulance, and that conversation was captured on the body camera. Officer Keeney testified at trial that Hunziker's demeanor in the ambulance and hospital swayed between crying, humming, and smiling; she seemed polite and did not appear intoxicated. In the video, shown at trial, Hunziker could be overheard conveying her version of events. She described how she parked a ways down from her ex-husband's house after years of unheeded claims of abuse and molestation and had it "all planned out"; went in with a knife in her hand; and started stabbing him, aiming for arteries. She reported that she had taken her mental-health medication but also drank some UV Blue liquor. She stated she had cut her hand when Jason tried to take the knife from her. Hunziker also explained she had planned to commit suicide so that J.H. could go live with her brother.

Officer Keeney stayed with Hunziker in the hospital until Officer Gary Manhart relieved him. Though Officer Manhart also did not speak with Hunziker, he heard her telling medical staff about hearing voices in her head and suicidal ideations. At one point, before she left to shower, she began pressing on the wounds on her hands and said the voices told her she needed to die. That said, no police reports reflected her saying that the voices told her to kill Jason. Eventually, she was taken to jail.

Hunziker waived her right to a speedy trial, and the proceedings were continued until December 2019. Twice in that time, Hunziker asked for different counsel. The first time, November 21, 2017, she cited a conflict of interest with her current attorney. When she appeared at her arraignment on November 28 with her counsel, the court did not ask about the motion and Hunziker did not bring it up. Without further hearing, the court denied the order the next day. Yet again, on May 8, 2019, Hunziker requested new counsel, citing her belief that her attorney was not working very hard on the case and was difficult to reach. The district court held a hearing, and Hunziker testified that her trial had been continued twice[4] so she would prefer different counsel. Asked about her reasons for a change, she never mentioned a conflict of interest. Hunziker's attorney stated that she and Hunziker had discussed ways to communicate with phone appointments and what times Hunziker could contact her to ensure she was available. The court determined that Hunziker's concern did not require new counsel to be appointed

---

[4] One of these continuances was because of a medical emergency suffered by her attorney.

and once more denied the motion; the same attorney continued to handle the case through trial.

Hunziker was found competent to stand trial.[5] Leading up to trial, she filed notice of her intent to rely on a defense of insanity or diminished responsibility. Hunziker has a documented personal and family history of mental illness. Both the State and Hunziker intended to present expert witnesses to testify to her mental state at the time of the killing. Hunziker's expert witness was a medical doctor, Dr. Thomas Gratzer. However, based on a miscommunication between defense counsel and Dr. Gratzer, the expert witness was unavailable for the set trial date and had limited availability in the months following. Hunziker moved for a continuance and presented oral argument on the issue at the pretrial hearing, which the court denied. In the denial, the court noted that Hunziker had been given ample time to prepare and that everyone else had fit their schedules around this date—the witness, the court opined, would simply need to rework his schedule, even if it required a subpoena. As a compromise, the court offered the options, subject to the State's agreement, of presenting the witness's testimony out of order or filming a video deposition that could be played at trial. Both Hunziker and the State agreed to a video deposition.

The State's expert was Dr. Veronica Lestina, a doctor of psychology. Dr. Lestina testified that she reviewed text messages between Hunziker and Jason, the forensic interviewer's report, the video of J.H.'s interview with the a child

---

[5] Hunziker reported, in the competency review, that she had been taking her prescribed medications consistently since two months before the murder because "hearing voices is not fun."

protection center, audio interviews of Hunziker, the body camera footage, the reports Hunziker had made to the Iowa Department of Human Services, the investigative information of the case, the competency assessment, Dr. Gratzer's psychiatric evaluation, Hunziker's mental-health records from various institutions, and communications between the sheriff's office and law enforcement staff. She also spent five hours with Hunziker.

Through psychological testing, Dr. Lestina diagnosed Hunziker with borderline personality disorder, major depressive disorder, mild generalized anxiety disorder, and alcohol use disorder.[6] Still, she did not believe that Hunziker was insane at the time of the crime because her mental diagnoses were not severe enough to inhibit her "capacity or . . . ability to form specific, premeditated and deliberate intent, in this case to kill." During Dr. Lestina's interview with Hunziker, Hunziker reported that, as she walked into Jason's home, she had to stop and "get the guts" to go through with her plan because taking a life was "a really big deal." While Hunziker stated she heard her son's voice in her head, she recognized it was not really him speaking to her because she had checked that he was sleeping. Her ability to distinguish what was real from what was not indicated to Dr. Lestina that Hunziker was not experiencing a severe psychotic episode at the time of the killing. Further, her overall ability to plan and execute the killing did not support a finding of being in a psychotic episode. After a full analysis of Hunziker's past

---

[6] Over the course of several hospitalizations, Hunziker's diagnoses have varied, including psychosis, bipolar disorder, alcohol use disorder, marijuana use disorder, and schizophrenia. At the time of the killing, she was taking a sleeping medication, an anti-psychotic, and an anti-depressant. Bottles of the antipsychotic and antidepressant were both found in her residence.

medical history, Dr. Lestina maintained that Hunziker's capacity was not diminished at the time she killed Jason.[7]

At the close of the State's evidence, Hunziker moved for judgment of acquittal, claiming that when the facts were viewed in the light most favorable to the State, the elements of the offense had not been proven. The State resisted, and the court ultimately dismissed the motion.

Dr. Gratzer's testimony, as Hunziker's only witness, told a different story. He reviewed Hunziker's medical records (both outpatient and inpatient) and Dr. Lestina's report, reviewed criminal complaints about the offense and police reports, and interviewed Hunziker twice—once in person and once over the phone. In the video deposition played for the jury, Dr. Gratzer diagnosed Hunziker with psychosis and "schizophrenia or schizo-affective disorder, which causes her to become psychotic and lose touch with reality." This, he opined, was why she suffered from delusions of her son being sexually abused. He believed this also aligned with her past treating providers' diagnoses[8]—diagnoses caused by a chemical imbalance best treated by a psychiatrist like himself, not a psychologist like Dr. Lestina. He did not believe Hunziker had borderline personality disorder because of the consistency and length of her psychosis.

In the opinion of the expert, psychotic episodes with Hunziker's mental illness could be triggered by a lack of sleep, and Dr. Gratzer testified that Hunziker

---

[7] There was also disagreement between the doctors about whether Hunziker was taking her sleeping medication at the time of the murder. Dr. Lestina testified that Hunziker had disclosed a habit of taking medication from her mother when she ran out of her own. Dr. Gratzer pointed to pharmacy records that showed her prescriptions had not been renewed.

[8] These medical records were not admitted into evidence.

had not refilled her sleep medication prescription in the week leading up to the murder. He also opined that the antipsychotic medication Hunziker was taking at the time of the killing was not the strongest option. Dr. Gratzer believed that Hunziker was experiencing psychosis both when she was interviewed by police and when he interviewed her in the summer of 2018. In his interview of Hunziker, she told him that, before the killing, she had been doing fairly well, but in the days just before the offense, she was struggling to sleep without her medication and began suffering from hallucinations and paranoid delusions. With these thoughts in her head and increasing psychosis, she became convinced that she had to kill Jason.

Dr. Gratzer ultimately concluded that this psychosis at the time of the murder would deem her "insane" according to Iowa statute. Specifically, the psychosis prevented her from understanding the wrongfulness of her actions because she believed she had to kill Jason to save her son. Dr. Gratzer repeatedly pointed out that, while Hunziker admittedly understood her actions to be legally wrong, she believed she had no alternative and was morally correct. He did not believe that her ability to form and carry out a plan negated the possibility that she was experiencing psychosis. But he confirmed that Hunziker never claimed the voices she heard told her to kill Jason.

At the close of defense's evidence, Hunziker renewed her motion for judgment of acquittal, asserting that not only had the State failed to meet its burden, but that Hunziker had proven her insanity defense beyond a preponderance of the evidence. The court again disagreed and sent the case to the jury.

On the insanity defense, the jury was instructed:

Instruction No. 21: The defendant claims she is not criminally accountable for her conduct by reason of insanity. A person is presumed to be sane and responsible for her acts.

Not every kind or degree of mental disease or mental disorder will excuse a criminal act. "Insane" or "insanity" means that, at the time the crime was committed, the defendant suffered from such a diseased or deranged condition of the mind that it made her either incapable of knowing or understanding the nature and quality of her acts or incapable of distinguishing between what was *legally* right and *legally* wrong in relation to the acts.

A person is "sane" if, at the time she committed the criminal act, she had sufficient mental capacity to know and understand the nature and quality of her acts and had sufficient mental capacity and reason to distinguish *legal* right from wrong as to the particular acts.

To know and understand the nature and quality of one's acts means a person is mentally aware of the particular acts being done and the ordinary and probable consequences of them.

Concerning the mental capacity of the defendant to distinguish between right and wrong, you are not interested in her knowledge of moral judgments, as such, or the rightness or wrongness of things in general. Rather, you must determine the defendant's knowledge of wrongness *as to what society has fixed and established as law* so far as the acts charged are concerned. This means mental capacity to know the acts were *legally* wrong when she committed them.

The defendant must prove by a "preponderance of the evidence" that she was insane at the time of the commission of the crime.

Insanity need not exist for any specific length of time before or after the commission of the act.

Instruction No. 22: If the State has proved all of the elements of a crime or a lesser-included crime, you should then determine if the defendant has proved she was insane.

In order for the defendant to establish she was insane, she must prove by a preponderance of the evidence either of the following:

1. At the time of the crime or a lesser-included crime was committed, the defendant suffered from such a diseased or deranged condition of the mind as to render her incapable of knowing the nature and quality of the acts she is accused of committing;
   or
2. At the time the crime or a lesser-included crime was committed, the defendant suffered from such a diseased or deranged condition of the mind as to render her incapable of

distinguishing between what was *legally* right and *legally* wrong in relation to the act.

If the defendant has proved either of these elements by a preponderance of the evidence, as explained in Instruction No. 9, then the defendant is not guilty by reason of insanity. If the defendant has failed to prove either of the elements by a preponderance of the evidence, then the defendant is guilty of a crime if the State has proved all of the elements of the crime.[9]

These jury instructions repeatedly delineated between what one might consider morally right and wrong and what one knew to be legally right and wrong, a distinction not overtly drawn in the Iowa uniform jury instructions. Hunziker objected to these instructions at trial and filed a post-trial motion for a new trial and in arrest of judgment. She believed the instructions were confusing to the jury and, instead, the uniform instructions should have been used. The oral arguments on the motion made clear that Hunziker's argument was, while she was not *actually* justified in murdering her ex-husband, her delusion led her to believe the murder was morally right. Hunziker claimed that these jury instructions focused too heavily on her legal understanding and made it "more difficult to emphasize her position . . . that she believed it was the right thing to do because of perceived abuse."[10] Both at trial and after, the court concluded that the jury instructions accurately reflected the case law. Both motions were denied.

The jury found Hunziker guilty of first-degree murder.

In her motion for new trial and in arrest of judgment, Hunziker challenged the denial of her request for a continuance. In a post-trial motion, she argued that

---

[9] The italicized words are those the district court added to the Iowa uniform jury instructions.

[10] What should not be left unsaid is that if the jury had acquitted Hunziker on this theory, it would have been on a basis not supported by the law.

she was prejudiced by the method of Dr. Gratzler's testimony because it had to be recorded before the State's presentation of evidence and also impacted the credibility determination of the jury. This motion was also denied.

Finally, in her request for a new trial and arrest of judgment, Hunziker asserted that the jury's verdict was contrary to the weight of the evidence presented and insufficient evidence supported her conviction. As to these issues, the motions were also denied.

Hunziker was sentenced to life in prison without the chance for parole and ordered to pay restitution of $150,000 to Jason's estate or heirs. The court also entered a no-contact order preventing Hunziker from contacting J.H. for five years. Hunziker appeals.

## II. Discussion.

Hunziker argues the court erred in denying her request for a continuance based on the unavailability of her expert witness and in deviating from the uniform jury instructions on the insanity defense. She also claims that the jury verdict was contrary to the weight of the evidence. She asserts that the court erred in denying her motions seeking substitute counsel. Finally, she asks us to abandon Iowa Code section 814.7 (2020) and allow her to raise an ineffective-assistance-of-counsel claim on this direct appeal or, in the alternative, evaluate her claims under plain error.

**A. Denial of request for continuance based on unavailability of Hunziker's expert witness.**

We review a district court's decision to deny a continuance for an abuse of discretion and only disturb the ruling if an injustice has resulted. *State v. Artzer*,

609 N.W.2d 526, 529–30 (Iowa 2000). "Motions for continuance are discouraged. A motion for continuance shall not be granted except upon a showing of good and compelling cause." Iowa R. Crim. P. 2.9(2). "The standard recognizes the interest of both the state and the defendant in a speedy and fair trial." *Artzer*, 609 N.W.2d at 530. Thus, the trial court had some latitude to make this call.

On appeal, Hunziker argues that the denial of her request for continuance was unreasonable and resulted in injustice. First, she states there was no evidence that the continuance was intended to delay trial; it was simply her counsel's mistake that required the delay. But because the district court has broad discretion to deny a motion to continue, there are times where witnesses are prevented from being at trial, even at no fault of the party, and continuances are denied. *See State v. Hodges*, No. 10-0031, 2011 WL 944378, at *3 (Iowa Ct. App. Mar. 21, 2011) (upholding the denial of a continuance even when factors preventing an expert witness from appearing were unexpected and out of the defendant's control). Here, Hunziker was not denied the expert's presentation to the jury as in *Hodges*, but only limited to the manner and timing of the presentation. *Id.* And even with diligent preparation or communication with a witness, an unanticipated event does not always rise to the "good cause" expected for a continuance.[11]

Hunziker next argues that, because Dr. Gratzer was her only witness and she had the burden of proof on the insanity issue, she was prejudiced because the

---

[11] Compounding the issue, based on the other party's schedule, a continuance would have likely moved the trial out another six months.

video deposition inhibited the jury's evaluation of credibility.[12]   Specifically, it prevented the jury from seeing the "witness's facial expressions, vocal intonation, eye movement, gestures, posture, body language, and courtroom conduct, both on and off the stand, that would not come across in a transcript."  One can assert, as Hunziker does here, that in-person testimony allows the finder-of-fact an "up-close" opportunity to judge credibility.  In this age of technology, use of video presentation likely would not be unusual to an average juror.  And Hunziker's concerns about what would be lost in reading testimony from a transcript do not fit the facts of these proceedings as she presented far more than a transcript.  All of the nonverbal cues she lists could be seen in the video presented to the jury.[13]  We will not "reverse[] on appeal unless an injustice has resulted."   *State v. Leutfaimany*, 585 N.W.2d 200, 209 (Iowa 1998).  We find no injustice here.

Ultimately, the court did not abuse its discretion in denying the motion to continue.

**B. Jury instructions regarding the insanity defense.**

The district court deviated from the uniform jury instructions by inserting phrases that clarified the insanity defense involved Hunziker's understanding of the legal right and wrong of her actions, not the moral right and wrong.  Hunziker objected to these insertions at trial, preserving error.  *See State v. Taggart*, 430 N.W.2d 423, 425 (Iowa 1988).  "We review challenges to jury instructions for

---

[12] Hunziker also objects to the video having to be redacted, arguing it came across disjointed, but on our review, it is not difficult to follow and the delivery and opinions were clear.

[13] With this exact concern in mind, the trial court disallowed phone testimony when the State presented the option.

correction of errors at law," ensuring they are accurate statements of the law. *State v. Shorter*, 945 N.W.2d 1, 6 (Iowa 2020) (citation omitted).

Hunziker believes this deviation misstated, and was contrary to, Iowa law. Iowa has long followed some iteration of the *M'Naghten* test for the insanity defense. *M'Naghten's Case*, 10 Cl. & F. 200, 210, 8 Eng. Rep. 718, 722 (H.L. 1843); *see State v. Harkness*, 160 N.W.2d 324, 330 (Iowa 1968) (citing *State v. Buck*, 219 N.W. 17, 21 (Iowa 1928)). *M'Naghten* itself does not distinguish between legal and moral understanding. *State v. Hamann*, 285 N.W.2d 180, 183 (Iowa 1979) (noting the words "right" and "wrong" in section 701.4 refer to legal right and wrong, not moral right and wrong). But our courts have repeatedly focused the test on whether the defendant understood the legal right and wrong of their actions. *State v. Jacobs*, 607 N.W.2d 679, 684 (Iowa 2000); *State v. Collins*, 305 N.W.2d 434, 436 (Iowa 1981); *Hamann*, 285 N.W.2d at 183; *State v. Abdinur*, No. 17-0247, 2018 WL 2731624, at *3 (Iowa Ct. App. June 6, 2018). It is true that courts should generally utilize the uniform jury instructions. *State v. Davis*, 951 N.W.2d 8, 17 (Iowa 2020). But deviations are allowed, especially when "[t]he deviations from the uniform instruction do not significantly change the definition of [the crime] and do not deprive defendant of any defense." *State v. Hatter*, 414 N.W.2d 333, 336 (Iowa 1987). Although the addition of "legally" into the instructions would have made it more difficult for Hunziker to argue her belief that she was morally justified in murdering her ex-husband, it is not the instructions that deny her that defense—it is the case law. And, encouraging the jury to replace our settled case law and rely on Hunziker's moral beliefs would lead to jury nullification, or "the jury's 'right to acquit a defendant even if its verdict is contrary

to the law and evidence,'" *State v. Leedom*, 938 N.W.2d 177, 193 (Iowa 2020) (citation omitted), which our supreme court has prohibited, *Kinseth v. Weil-McLain*, 913 N.W.2d 55, 72 (Iowa 2018); *State v. Willis*, 218 N.W.2d 921, 924–25 (Iowa 1974) ("Jury nullification exalts the goal of particularized justice above the ideal of the rule of law. We are persuaded the rule of law should not be subverted."). The jury instructions as modified were not a misstatement of the law and do not warrant disturbing her conviction.

### C. Weight of the evidence.

In her motion for a new trial, Hunziker challenged the jury's verdict, arguing it was contrary to the weight of the evidence. The district court denied the motion as to the weight of the evidence, stating that the verdict was "well supported by the evidence in the record." "We review a denial of new trial on the ground the verdict is contrary to the weight of the evidence for abuse of discretion," *State v. Veal*, 930 N.W.2d 319, 328 (Iowa 2019), but we do not review the ultimate question of the balance of credible evidence, *State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003). "A verdict is contrary to the weight of the evidence 'where a greater amount of credible evidence supports one side of an issue or cause than the other.'" *State v. O'Shea*, 634 N.W.2d 150, 154 (Iowa Ct. App. 2001) (citation omitted). This is an uncommon occurrence—"a district court may invoke its power to grant a new trial on the ground the verdict was contrary to the weight of the evidence only in the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016).

Hunziker lays out the evidence that points to her mental condition at the time of the killing and her perceived moral justification for the murder. Still, both

expert witnesses made clear that Hunziker knew that her actions were legally wrong—a lynchpin of Iowa's insanity determination as discussed above. No evidence was presented to contradict Hunziker's understanding what she did was *legally* wrong. *See Reeves*, 670 N.W.2d at 207 ("Moreover, there was no contrary evidence in the record. This is not one of those cases where the jury had to believe one of two people in arriving at a verdict."). Hunziker's evidence alone would have disallowed the insanity defense. The court did not abuse its discretion in finding that the weight of the evidence supported the verdict and denying the motion for new trial.

**D. Request for substitute counsel.**

After filing two motions relating to her court-appointed counsel, Hunziker believes the court erred in denying her motions for new counsel and failed to make a sufficient inquiry into her claims. Our court has summarized the expectations for appointed counsel:

> A defendant has a right to counsel at all critical stages of the criminal process. No defendant, however, has an absolute right to be represented by a particular counsel. The grounds to justify the appointment of substitute counsel include a conflict of interest, irreconcilable conflict, or a complete breakdown in communication between the defendant and counsel. The court must balance the defendant's right to counsel of his [or her] choice and the public's interest in the prompt and efficient administration of justice.

*State v. Mott*, 759 N.W.2d 140, 148–49 (Iowa Ct. App. 2008) (citations omitted).

We review the court's decision not to appoint substitute counsel for an abuse of discretion. *State v. Tejeda,* 677 N.W.2d 744, 749 (Iowa 2004). A failure to address a request for substitute counsel, however, is reviewed de novo. *Id.* Hunziker's motions to the district court preserved her complaints of a conflict of

interest and a breakdown in communication with her counsel, as well as whether the court provided sufficient inquiry into these complaints. *See id.* The State argues that error was not preserved as to the inquiry issue, distinguishing Hunziker's claim from *Tejeda*, where no inquiry was made. In doing this, the State conflates Hunziker's two motions—two distinct claims with distinct rulings that must be evaluated separately. As to the first motion, no inquiry was had, just as in *Tejeda*. And, as to the second, the Iowa Supreme Court has not required any motions beyond the request for substitute counsel to preserve a claimed error in the court's inquiry following a claim of breakdown in communication. *See State v. Lopez*, 633 N.W.2d 774, 778, 780 (Iowa 2001) (analyzing the insufficient-inquiry issue after some inquiry, ultimately deemed adequate, was made into a defendant's claim of a breakdown in communication). We will not now limit *Tejeda* to only those cases that involve no inquiry. Error as to both claims has been preserved.

Hunziker first argues that the district court should not have dismissed her request for substitute counsel without sufficient inquiry. She asserted, in a pro se motion before her arraignment, that she and her attorney had a conflict of interest. "The test [for the presence of a conflict of interest] is whether 'an attorney is placed in a situation conducive to divided loyalties.'" *Pippins v. State*, 661 N.W.2d 544, 548 (Iowa 2003) (citation omitted). But the district court did not respond to the motion until after the arraignment proceedings occurred. As the arraignment concluded, the district court asked, "Anything further for the record?" Although Hunziker attended, she made no request for new counsel and did not raise the conflict concerns. Then, addressing the pro se motion about the conflict of interest,

the district court determined, "The application filed by the defendant, pro se, on November 21, 2017, is denied. The defendant and court-appointed counsel appeared at and completed arraignment proceedings on November 28, 2017, without any renewal of the application."

Courts have "the duty sua sponte to inquire into the propriety of defense counsel's representation when it 'knows or reasonably should know that a particular conflict exists.'" *State v. Watson*, 620 N.W.2d 233, 238 (Iowa 2000) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 347 (1980)). Depending on what exactly the court knew, different remedies are appropriate:

> If an actual conflict existed and the trial court knew or should have known of the conflict, yet failed to make inquiry, reversal is required. If the record on appeal shows only the possibility of a conflict, then the case must be remanded for a determination as to whether an actual conflict existed and/or whether the defendant made a valid waiver of his right to independent counsel.

*Id.* (internal citation and footnote omitted).

Focused on Hunziker's pro se motion asserting a conflict, she urges the district court's failure to inquire about the specifics of that conflict requires a remand to the district court so it can "inquire into whether an actual conflict existed." *See State v. Powell,* 684 N.W.2d 235, 239–41 (Iowa 2004) (holding defendant's complaints about counsel's conflict of interest warranted a full inquiry by the court such that the court abused it discretion by failing to do so and requiring a remand); *see also Connor v. State,* 630 N.W.2d 846, 848–49 (Iowa 2001) (finding court's failure to discharge the duty to inquire into the alleged conflict mandated a remand to make the required inquiry and to rule accordingly). *Powell* dealt with complaints of a conflict where Powell's attorney also represented a defendant in "another

criminal case directly related to [Powell's]" and who "might be called as a witness." 684 N.W.2d at 239. *Connor* addressed a conflict where the defendant filed an ethics complaint against his trial counsel but was not allowed to alert the court to the facts of the complaint. 630 N.W.2d at 849. The State distinguishes the *Powell* and *Connor* cases from the facts here and asks us to address the issue under *State v. Smitherman*, 733 N.W.2d 341, 347–49 (Iowa 2007) (noting inquiry in some form, without objection and with acquiescence in the representation, "ameliorates the suspicion of harm and lessens the need for a rigid rule of automatic reversal").

Hunziker's allegation alone is not sufficient to raise her claim to an actual conflict. *See State v. McKinley*, 860 N.W.2d 874, 880 (Iowa 2015) ("A conflict does not exist just because one party asserts it does."). The law rarely requires magic words, and the unsubstantiated use of "conflict of interest"[14] cannot here cast a reversal charm. *State v. Price*, No. 13-0857, 2014 WL 1494952, at *4 (Apr. 16, 2014) ("We have no knowledge of what it was [the appellant] termed a 'conflict of interest.' We are unwilling to hinge the appropriate remedy based on a layman's use of the term 'conflict of interest' without any amplification."). The record offers no support for Hunziker's claim of conflict.[15] On our de novo review, however, the

---

[14] Our supreme court discussed conflict in *Powell*, saying:

> A conflict of interest places a defense attorney in a situation inherently conducive to divided loyalties. The phrase "conflict of interest" denotes a situation in which regard for one duty tends to lead to disregard of another; where the lawyer's representation of one client is rendered less effective by reason of his representation of another client; or where it becomes a lawyer's duty on behalf of one client to contend for that which his duty to another client would require him to oppose.

684 N.W.2d at 238 (quoting *Pippins*, 661 N.W.2d at 238).

[15] The only explanation for her complaint in the record comes from her competency evaluation. In that report, the physician noted that Hunziker did not originally trust

allegation alone should have prompted the court to inquire—if Hunziker's first allegation been her only, our outcome might be different. Still, remand is unnecessary because Hunziker had a second opportunity to discuss any conflict she perceived where the district court did directly ask about her complaints with counsel.

Like a conflict of interest, courts also have a duty to inquire when a party asserts a breakdown in communication between them and their counsel. *Tejeda*, 677 N.W.2d at 750. A breakdown in communication that would create unconstitutional representation does not occur with only "general frustration and dissatisfaction with defense counsel expressed by a defendant . . . . The focus of the inquiry is not on the defendant's relationship with his or her attorney, but 'the adequacy of counsel in the adversarial process.'" *State v. Bogg*, 741 N.W.2d 492, 506 (Iowa 2007) (citation omitted). A court need not conduct a full hearing upon an allegation of a breakdown in communication—it must only inquire into the concern. *Tejeda*, 677 N.W.2d at 751. Adequate inquiry is made when "the presiding judge, when apprised of a potential breakdown in communication, personally asked the defendant at a hearing to explain the nature of the communication problem." *Id.* When the defendant provides no reason to believe that such a breakdown has occurred, a court does not abuse their discretion in denying the request for substitute counsel. *Lopez,* 633 N.W.2d at 781.

In Hunziker's second motion for new counsel, she said, "I would like to switch attorneys. I have been here for about a year & a half—I don't see [counsel]

---

her attorney, potentially because she was hearing voices through the jail's intercom system that said her appointed counsel was not good.

working on my case. She is very hard to get ahold of and I rarely talk to her or see her. Please give me a different attorney." Upon receiving the motion, the court conducted a hearing and allowed Hunziker to explain her concerns, asking her directly to explain the issue. Hunziker did so, stating that her counsel was difficult to get a hold of and had been sick. The district court asked Hunziker if there was "anything else." Hunziker replied, "No, that's it." Notably, Hunziker made no comment about any conflict of interest she had with her trial counsel or the public defender's office specifically.

Then, the district court also asked Hunziker's counsel's input—counsel explained that she and Hunziker had discussed some solutions to ensure they could be in contact. The district court determined that the concern was "well short of the standard that would need to be met before [the court] would remove the counsel from [Hunziker's] case and appoint different counsel to represent [her]."

With that background, the district court did make the appropriate inquiry and, in its discretion, found that a complete breakdown between counsel and Hunziker had not occurred. After drawing out all of Hunziker's issues with her counsel, the court was assured that Hunziker's concerns were addressed. The district court's follow up order confirmed "[trial counsel] shall address [Hunziker's] concerns regarding preparation for the upcoming trial." Likewise, we find no evidence in the record supporting a conflict of interest claim, even in laymen terms. Hunziker failed to show sufficient cause to remove her trial counsel. *See Lopez*, 633 N.W2d at 778–79. We find the district court did not abuse its discretion and affirm both denials of the motions for substitute counsel.

**E. Ineffective assistance of counsel and the failure to properly preserve sufficiency-of-the-evidence challenge.**

In her first motion for judgment of acquittal, Hunziker argued that the facts presented by the State "failed to generate a jury question with respect to the elements of the offense." In her renewal of the motion at the close of her evidence presentation, Hunziker repeated this concern without addressing a specific element of the crime and asserted she had met her burden for the insanity defense. She admits this did not preserve a sufficiency-of-the-evidence claim for appeal. *See State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004). Because of this, Hunziker claims her trial counsel was ineffective. However, because disposition was entered in January 2020, she recognizes that Iowa Code section 814.7 prevents her from raising an ineffective-assistance-of-counsel claim on direct appeal. *See State v. Damme*, 944 N.W.2d 98, 103 n.1 (Iowa 2020) (providing that the amended section 814.7 applies to cases where the judgment was entered on July 1, 2019 or later). She challenges the statute based on separation of powers, due process, and equal protection.

The State argues that Hunziker's constitutional challenges to Iowa Code section 814.7 were not raised in the district court and so cannot be raised on appeal. While it is true that these claims were not made before, Hunziker did not have to raise an ineffective-assistance-of-counsel claim in the district court, so she had no opportunity to challenge the constitutionality of section 814.7 until on appeal. The underlying principles of error preservation are to "afford[] the district court an opportunity to avoid or correct error" and "provid[e] the appellate court with an adequate record in reviewing errors purportedly committed." *State v.*

*Ambrose*, 861 N.W.2d 550, 555 (Iowa 2015) (altered for readability). As neither of these principles would have been furthered by Hunziker attempting to raise this issue to the district court, we take on Hunziker's constitutional challenges to section 814.7. *See State v. Treptow*, 960 N.W.2d 98, 104, 107 (Iowa 2021); *see also State v. Trane*, 934 N.W.2d 447, 464 (Iowa 2019) (holding post-trial motions to the district court are not the appropriate time to raise claims of ineffective assistance); *cf. State v. Milner*, 571 N.W.2d 7, 12 (Iowa 1997) (addressing the merits of the claim where "[u]nder the circumstances of the case" the defendant "raised the constitutional issues at the earliest available opportunity"). Still, though we address her concerns here, they are all well settled in Iowa case law.

The Iowa Supreme Court has already determined "section 814.7 does not violate the separation-of-powers doctrine." *State v. Tucker,* 959 N.W.2d 140, 151 (Iowa 2021). Nor does it inhibit due process and the right to effective counsel on appeal—under Iowa law, "[t]he right to the effective assistance of appellate counsel where direct appeal is available does not create an entitlement to direct appeal as a matter of right and a further entitlement to present any and all claims on direct appeal as a matter of right." *Treptow*, 960 N.W.2d at 107. Hunziker's separation-of-powers and due process arguments fail.

What remains is Hunziker's equal protection claim. When we review equal protection, we begin with "determin[ing] whether the challenged law makes a distinction between similarly situated individuals with respect to the purposes of the law." *Id.* at 104. Hunziker argues that, among all those criminal defendants who have been wrongly convicted based on insufficiency of the evidence, those who had effective counsel are treated differently than those who did not. Those

who had effective counsel can address their complaint on direct appeal, while those whose counsel was ineffective are left to wait for postconviction relief. We recently considered a similar case in *State v. Crawford*, No. 19-1506, 2021 WL 3392798, at *1 (Iowa Ct. App. Aug. 4, 2021). There, the appellant argued that "the law distinguishes between those defendants who have been convicted based upon insufficient evidence who were properly represented and those who were improperly represented." *Crawford*, 2021 WL 3392798, at *1. As we pointed out in that case, the Iowa Supreme Court has already decided that these groups are not similarly situated, and so an equal protection argument based on these distinctions must fail. *Treptow*, 960 N.W.2d at 105–06 ("[T]hose asserting claims other than a claim of ineffective assistance of counsel are not similarly situated to those asserting claims of ineffective assistance of counsel. A claim of ineffective assistance of counsel is more than an error preservation device; it is a substantive legal claim with its own elements."); *State v. Dudley*, 766 N.W.2d 606, 616 (Iowa 2009) ("If a plaintiff cannot show preliminarily that persons in the two classes are similarly situated, we have concluded the court need not determine whether there is a constitutionally adequate basis for the persons' different treatment."). As a result, Hunziker's equal protection argument cannot succeed.

In this same vein, if we do not allow her to claim ineffective assistance of counsel on direct appeal, Hunziker asks us to adopt plain-error review. The Iowa Supreme Court has repeatedly declined to adopt the plain-error rule. *See, e.g.*, *State v. Martin*, 877 N.W.2d 859, 866 (Iowa 2016). We cannot do so now.

Ultimately, as to Hunziker's claim her counsel was ineffective for failing to preserve a sufficiency-of-the-evidence claim for appeal, we can only preserve that issue for postconviction relief.

**III. Conclusion.**

After addressing each of Hunziker's challenges, we affirm Hunziker's conviction.

**AFFIRMED.**